**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ERIKA E. COBURN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO:** |
| | § | |
| **USP TEXAS, L.P.,** | § | |
| | § | |
| *Defendant.* | § | ***DEMAND FOR JURY TRIAL*** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE:

Plaintiff, **ERIKA E. COBURN**, (hereinafter referred to as "Plaintiff" or **"COBURN"**) files this Plaintiff's Original Complaint and Jury Demand against **USP TEXAS, L.P.**, (hereinafter referred to as "Defendant" or **"USP"**) for Age Discrimination i.e. violations of the Age Discrimination in Employment Act **("ADEA")** as amended by the Older Workers Benefit Protection Act **("OWPBA")**, Hostile Work Environment, Retaliation and Wrongful Termination. In support thereof, Plaintiff respectfully states as follows:

**I. PARTIES**

1.     Plaintiff **ERIKA E. COBURN** is a fifty-nine (59) year old, female, who resides in Dallas, Dallas County, Texas.

2.     Defendant **USP TEXAS, L.P.,** is a Texas Limited Partnership with its headquarters located in Dallas, Texas and with a work place facility known as *Baylor Surgical Hospital at Fort Worth*, 1800 Park Place Avenue, Fort Worth, Texas 76110 and who may be served with process by serving its registered agent for service of process: ***CT Corporation System, 350 N. St. Paul Street,***

*Suite #2900, Dallas, Dallas County, Texas 75201*.

3.      At all times relevant herein, USP Texas, L.P. has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## II. JURISDICTION

4.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451 (judiciary), 28 U.S.C. §1331 (federal question), 28 U.S.C. § 1337 (commerce), 28 U.S.C. §1343 (civil rights), 29 U.S.C. §623(a)(1) (age), 42 U.S.C. §2000e-5(f) (1) (unlawful employment practices) and (Title VII Enforcement).

## III. PENDANT STATE LAW CLAIMS

5.      Plaintiff invokes this Court's jurisdiction pursuant to Rule 18(a) of the Federal Rules of Civil Procedure and 28 U.S.C. 1367 hear and adjudicate claims arising out of the transactions set forth herein that violate rights and duties established by the laws of the State of Texas.

6.      The actions of the Defendant are further actionable under the Texas Commission on Human Rights Act and all of the above and foregoing allegations are incorporated into this claim by reference.

## IV. VENUE

7.      The employment practices of the Defendant alleged to be unlawful were committed within the jurisdiction of the Northern District of Texas, Fort Worth Division.  In addition, Defendant maintains a principal location within the Northern District of Texas, Dallas Division.  Additionally most if not all of the acts and failure to act complained of herein occurred within the Northern District of Texas, Fort Worth Division.   Accordingly, venue is proper pursuant to 28 U.S.C.

§1391(b) (1) & (2).

## V. EXHAUSTION OF ADMINISTRATION REMEDIES

8.      Prior to filing her Original Complaint, on or about August 8, 2018, Plaintiff on May 17, 2018, timely filed with the United States Equal Employment Opportunity Commission ("EEOC") within the appropriate number of days, her written initial charge of discrimination for Age Discrimination i.e. violations of the Age Discrimination in Employment Act **("ADEA")** as amended by the Older Workers Benefit Protection Act **("OWPBA")**, Hostile Work Environment, Retaliation and Wrongful Termination against Defendant. *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, (2008), 128 S.Ct. 1147 (2008); *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 577-78 (5th Cir. 1993); *Martinez v. Potter,* 347 F.3d 1208 at 1210 (10th Cir. 2003); *Deravin v. Kerik,* 335 F.3d 195, 200-01 (2d Cir. 2003).

9.      In conformance with the law, Plaintiff has filed this action subsequent to the expiration of ninety (90) days from the date of receiving her Notice of Rights aka "right to sue" letter from the EEOC and within two (2) years after Defendant willfully violated Plaintiff's rights.  Plaintiff received her Notice of Rights aka "right to sue" letter from the EEOC; dated May 17, 2018 from the EEOC.  On or about August 8, 2018, Plaintiff filed her Original Complaint and Jury Demand (Doc. 1) with this Court.  Plaintiff has exhausted all administrative remedies; therefore all conditions precedent to the Plaintiff maintaining this civil action have accrued, occurred, or been waived.  *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

## VI. CONDITIONS PRECEDENT

10.     All conditions precedent; to Plaintiff bringing her claims against Defendant

for Age Discrimination i.e. violations of the Age Discrimination in Employment Act

**("ADEA")** as amended by the Older Workers Benefit Protection Act **("OWPBA")**,

Hostile Work Environment, Retaliation and Wrongful Termination have either

been performed, have occurred or have been waived.

## VII. PROTECTED CLASS MEMBERSHIP

11.     This lawsuit is brought under 42 U.S.C. §2000e et. seq. (Title VII): Title VII

prohibit employers from discriminating "against any individual with respect to their

compensation, terms, conditions, or privileges of employment because of such

individual's race, color, religion, sex or national origin.  *See:* 42 U.S.C. §2000e-

2(a).

12.     Additionally this lawsuit is brought under 29 U.S.C. §623(a)(1) and other

similar statutes that prohibits employers from discrimination.

13.     Plaintiff identifies that she is a member of the following protected classes:

a)     over forty (40) years old; and
b)     sex-gender-(female); and
c)     Complained to her supervisors, HR Department, managers, directors and filed complaint with EEOC concerning unlawful employment conditions; and
d)     filed her Original Complaint with this court; and
e)     retaliation prohibited; and
f)     other applicable laws.

14.     Plaintiff identifies that she is a member of one or more of the protected

classes identified in paragraphs 11-13 above under Federal statutes and as

defined within the Texas Commission on Human Rights Act (TCHRA) which has

been codified into Chapter 21 of the Texas Labor Code and other similar

statutes.

## VIII. STATEMENT OF FACTS

15.    Here is Plaintiff's chronology of events *"In Her Own Words:"*

What happen at Baylor Surgical Hospital at Ft. Worth

Start date September 2016 until the 15th of May 2018

**September 2016**

The Department looked like a hurricane, tornado came through the department. I cleaned up the department and I made the employees do the work they were hired on doing. Jerry Criswall was the Director at the time over the Surgical area and Sterile Processing. Jerry, Laura Sittler CNO and Paul Debona CEO also wanted me to fix the Peel Packs, which I did. I put them in ABC order. One day in September Paul called me into the Office and ask me how I think things were going. I told him I think it is going well and I informed of what I have done so far. I told him I'm making progress in cleaning the department. He told me that the employees are sensitive and that I could not make them do the work they were hired on doing. He said you must be gentle with them they wear their hearts on their sleeves. Besides the peel packs also the documentation was not correct. I fixed all the documentation so it was correct.

Laura Sittler called me to the conference room and Jerry Criswall and Linda Marshall HR Director was present as well. Jerry became the assistant CNO but at this time he still was the Director over Surgery and Sterile Processing. Laura Sittler started out by saying that this was very hard for her and that she had a meeting with all my employees and that my employees told her that I would yell at them and use curse at them all the time. I try to say something, and Laura yelled at me and told me I needed to shut up and listen. When Laura finally did let me speak I told her that I never yelled at my employees and that nobody in the Hospital can say that I ever used cursed words. Linda Marshall said, it is the perception, she said you might spoke louder because of the Machines running and they thought I did yell.

After I was fired Gretchen Griffin which was one of my employees called me and informed me that Esmeralda Lopez which was one of my Supervisors told the staff to say that, I yelled and cursed at them all the time. Gretchen said because I made them do the work they were hired on doing. Esmeralda Lopez is very close friends with Paul Debona that is how she got the job as Supervisor.

### November and December of 2016

After I had fixed the Peel Packs Jerry come to me and said the OR staff can't find anything. I told Jerry I don't understand how they can't find anything it is in ABC order and it is labeled including the size. Jerry informed me that the OR staff did not know the Instruments and they could not find anything. Jerry said that the OR staff would like to have the Forceps all together and the Retractors. I told Jerry no problem I can do that I just need to order different bins, so I can what the OR would like to have done. Jerry said okay, and I did place the order, but Materials never ordered the bins. Jerry and the OR staff went and undid all the work that I had done and created the same mess just on a smaller scale. (**I also send you a note that I had made with how the OR staff was talking to me and what I had said to Jerry).**

### Either June or July which ever month Jason Smith started to work at Baylor 2017

When Jason Smith started he once again started with the Peel Packs and Jason said he wanted them fixed. I told Jason that Jerry and the OR staff fixed the Peel packs just the way they wanted them. Jason then said, I want them fixed. I told him okay. Jason said he wanted William Bell to fix the Peel Packs. Since we were so busy Jason and William agreed to have them fixed in January 2018 since it would be slow, and we would have the time to fix the peel packs.

### Either June or July when Jason started. I want to say it was July of 2017

Jason would tell me that it was my fault if Vendors did not bring in the sets that were needed for cases the next day. Esmeralda used to make curtesy call to the Vendors to let them know that we had cases and the Vendors needed to bring in the sets by 1500hr. Jason told me that we are not going to do that any longer.

### August 2017

Jason told me that I had to make sure that the Patient sticker were put in the book for IUSS (Immediate Use steam Sterilization). I told Jason that this does not fall under my responsibilities but that it was the responsibility of the Circulator in the room which would be the Nurse to make sure that the documentation was filled out correctly and that the patient sticker was put in the book and that I don't have excess to the patient stickers since I am not a nurse. Jason said that I had to check every hour to make sure that the patient sticker was in the book and that everything was filled out. Jason said, if it there is no patient sticker he wanted me to find out which room the item belonged to, go to the room and tell them I needed a patient sticker and Jason also wanted me to tell him who I spoke to in the room.

A lot of times instruments would get lost and would not come back to Sterile Processing, Jason wanted me to watch the OR staff break down the room and watch the OR staff put all the instruments back into the sets they came out off. I told Jason that is not possible for me to watch all the rooms since I am just one person, and that it is not my responsibility but the OR's to make sure that Instruments are returned to Sterile Processing. I never did watch them break down the rooms since this is not humanly possible to do so. Jason would yell at me daily about patient stickers. A lot of times when I rounded to make sure I had all the Patient stickers I had no information what so ever. I would inform the Charge Nurse. Jason would tell me it was my fault that we didn't have the patient sticker. I told him that I am not the Circulating Nurse in the room that he needed to make the Nurses to their job that there is just so much I can do.  Jason would mentally abuse me on a daily with the same things repeatedly. Why did you not have the patient sticker I told you to find out which room it was in. If I did not know what was flashed or the room I could not find out. I would tell Jason I told either Karen Strickland or Wendy Hunka that I did not have the patient sticker that is all I could do.

**September 2017**

I was building new sets, so we would have more Instruments, so we would not have so many turnovers. I had placed some of the orders and Materials had placed some. As the instruments came in I would put them in the sets that I was building. Some of the Instruments where on back order. Jason would tell me each day that he wanted the sets up and I would inform Jason that I don't have all the Instruments and as they come in I put them into the set. I told Jason which Instruments are on back order and the ETA as to when they would arrive. Jason daily would tell me that he wanted the Instruments here now. Jason's mental abuse was so bad that I went to my doctor and told her what was going on. My doctor but me out of work for one week. I filled for FMLA and while I was out on FMLA Jason send me a message and scheduled a meeting with me even, so I was not at work. He told me that he would call me at 1300hr and that I needed to be available. When Jason called I did not answer my phone, I did not want to talk to him. Then I said I better call him back otherwise I get another written. When I called back Jason told me, I told you to be available at 1300hr that is what time I scheduled the meeting. Then he said wait and I get William. He did and when William came into the office Jason ask me if anything needed to get done and about orders. I told Jason he could have looked into the order book to see what I had ordered and what might come in.

**This happened in the same month but before I was out on FMLA September**

In September Jason and I were in his Office and he told me that he wanted to color code the Instruments. I informed Jason that he could not do that, that the tape and the coding holds bacteria and that the FDA said no more because of that reason. Infection Control, AAMI and state that you should not tape instruments. Since we can't clean under the tape it is not safe. When I told Jason the AAMI does not recommend to taping the instruments Jason said we don't have to do what AAMI is saying since it is not a Government Agency. I informed Jason that may be true but just like with Joint Commission you don't have to do what they tell you, but if you don't you can lose your accreditation. One morning when I came to work Jason was leaning against the wall, I said good morning and so did he. Jason then said, just so you know we are going to tape the instruments that is coming. He said I know you are against it, but we are going to tape the instruments. I told Jason again that the tape holds bacteria and it can harm a patient and I am not going to tape an Instrument. I told Jason that it was against FDA and since it is a government agency we cannot do that. I told Jason we had to do what the FDA and Infection Control was saying since it was a government agency. I also informed Jason just because AAMI is a volunteer agency when it goes to court AAMI becomes the law. I told Jason that he is the Boss and he is over the department and if that is what he wants to do he can go right ahead and do it, but I will not. One of the Vendors was sitting in the locker room and she said to me, what is he going to do follow you in here. I told here I guess he is.

After that the first write up came. Jason said that I was not doing my job, that I had an attendance issue, that I was violating the conduct policy. I told Jason that I am always at work. That I even get pre-approved permission to leave early if I need too. I told Jason I have all the documentation for the times I had ask for time off. While I was out on FMLA Jason had scheduled a meeting with me. I copied the message that Jason had send me and send it to a friend. I wrote under the message, who schedules a meeting when I cam out on FMLA, in German I wrote, that he was a sweetheart. That message I send by mistake to Jason.

### September 2017

When Jason gave me the first write up he told me that I had to be available 24/7 when he calls. Linda Marshall was present at that time as well. Jason also told me that from now on I had to come to work at 8am to 1700hr. I told Jason that would be incorrect since I don't get one hour for lunch so therefore I would be getting of at 16:30hr. I also told Jason that the Cell phone was my personal cell phone he that he could not dictate to me what to do with my phone. That he did not pay for my cell phone bill. I also told Jason that I do not have to be available 24/7 since I do not get compensated for the being on call. When I had received this write up he also gave me a write up because he said he felt offended by

the text message that I had send to him by mistake. I ask Jason what exactly offended you about the text message. Jason said, it just offended me. I told Jason, but it does not offend you when Wendy tell you, if you don't shut up I'm going to slap you in your face. Jason looked at me for a second and then replied sometimes people say things that they don't mean. I also told ask Jason what he had against me. Jason said because I always say no. I told Jason I'm not going to do something or let you do anything that would harm a patient.

**I received a written from Jason. I don't know if he had the written for that on it as well in September or if it was in January of 2018. He gave me that written the same time he wrote me up about the Bolt cutter. The Bold Cutter was in January of 2018. You should have that written then we know the exact day.**

**October 2017**

**Could have been end of September but I want to say it was October**

I went on Vacation on the 11 of October and did not return to work until the middle of November 2017. From September to the time I went on vacation daily Jason would ask me where supplies where.  In September or it might have been the beginning of October when the Hurricane hit Houston and Dallas was out of Gas at all the Gas stations Jason tormented me on the phone to the point that I cried and could not stop.

A week before we had a scope break and we just have one off. William Bell one of my Supervisors told Jason what he wanted him to do with the scope, get it repaired, see if we can get a new one. Jason did not give William and answer. The week the Hurricane hit on that Monday William once again gave Jason the paper work to sign so we could send in the scope and get a loaner. If I remember correctly it was on a Wednesday when Dallas had no gas. I always get Gas in the morning when I needed it and I needed to do the same that day. I called Jason and told me that I could not make it to work since I didn't have enough gas in my tank you to make to work. Jason told me that I better find gas and come to work. I told him I went to 8 Gas Station and that there was no gas. Jason said I better find gas and come to work. I told Jason that he was totally unreasonable and that I did not know that we would not have any gas. That the Hurricane did not hit Dallas and that our gas was coming form Oklahoma. I told Jason that I could not come to work, and I would do from home what I could. Jason then told me about he scope that was broken and that a doctor needed it and we didn't have one. I told Jason you had the paperwork to sign so we could get a loaner and you have not done that what William had told me. Jason then said he did not know any think about paper work that he had to sign. It was on a Thursday when we didn't have any gas in Dallas I remember now. Jason then told me he

wanted me to call around to see if we can borrow a scope. I informed Jason that William tried that already and Hospitals don't loan out this kind of scopes because the scopes are very expensive. Jason then told me he wanted to know who I talked to, what they said, and he wanted me to send him this each time I had spoken to someone.

After I got off the phone with Jason I was mentally distraught. I started to make telephone calls, and nobody would let me borrow a scope. I would email Jason with all the people I called and what the conversation was. I also called William and ask him what happen with the scope and why Jason didn't know nothing about it. William said that Jason did know about the scope that he signed the paperwork to get a loaner in and that Jason also knew that was put on the list for a loaner since Olympus did not have a loaner available. I then called the company and they said the scope was shipped out and it should have been delivered at the Hospital. I then called Jason and told him just that. He called me back and said that the scope was not in materials.

I called Laura Sittler and told her how Jason was mentally abusing me and that I do what he asks of me, but it is never enough. I told her that I didn't have gas in my car to make it to work and that Jason told me I should have foreseen that there would be on gas. I was so upset I cried and Laura just told me just see if you can find gas and come on in. I did call around and Kroger told me that they would have gas by noon. I then went and got gas and went to work. When I got to work I went to Materials to see if the scope was in Materials. It was. I ask when the scope came in I believe it was Hugo that I ask, and he said at 8am.

I cannot take the Flu shut, I have a bad reaction to the Flu shut. We had to wear a mask if we could not take the Flu shut which is fine. I was told by Jason that I had to wear the mask in the control room which is an Office that I shared with Karen Strickland and Wendy Hunka. I told Jason that the Office is not a patient care area and therefore I didn't need to wear the mask. Jason said I had to wear the mask or he is going to write me up. Every time I was alone in the Office I would not wear the mask and when someone come in I would put it back on. Jason said that I could not eat in the Cafeteria since it was a patient care area. I told him where I should eat then. Jason said I guess outside. I told Jason I'm not going to eat outside. He said you can find you a spot under a tree.

### October 2017

While I was out on vacation, Jason, Esmeralda, William and the OR staff put out the Instrument sets that I was building. The sets where not complete since some of the instruments were still on back order. The sets would have missing stickers on them, so the staff would know what was missing. Also, while I was out Esmeralda Lopez and William Bell changed

the time that they would like to come to work. When I came to work Jerry and Jason said that I was not doing my job and that sets are on the shelves with incomplete stickers. I went through all my orders and I showed Jason and emailed Jason all the dates that I had placed orders for instruments and supplies and what I had not received. I also send Jason via email the CER's that I had given to him for approval and had not received back. I was told by Jason and Jerry that anything over $1000 had to be put on a CER. I also made copies of all the CER's that I had given to Jason. Jerry and Jason both came into the control room and said that I did not had to put that on a CER since the line item was below $1000. I created then a requisition and send it to Materials. After I had created the requisition Jason came to me and told me that I had to put it on a CER since it was over $1000. I told Jason you and Jerry just told me that it didn't have to be on a CER since the line item was less than $1000. He said no it must be on a CER. Sometimes they would order the instruments and then come back and tell me I should have put it on a CER.

**End of November beginning of December 2017**

When I returned to work I looked my key into my locker and I could not get in. I went to Facilities, but nobody was in the office. I went to Facilities again after we had our morning huddle and it was still locked and nobody was in the office. I waited for awhile and went back again and it was still locked, and nobody was there. I saw Debbie in the hallway (Debbie is Medical Record Director).

Debbie said, still nobody their and I said not. Debbie said I needed them as well. Since I could not get into my locker I used our Bold Cutter and I had one of the guys help me break open my lock. I laid the Bold cutter on my desk. Jason came in and he ask me what happen to the Bold Cutter. I told Jason that I could not get into my locker and that nobody was in Facilities and I needed to open my locker. The Bold Cutter had a small dent in it and I told Jason I called Bryan with Mobile Instruments to see if he could fix it. Bryan came, and he said they could fix it and I related the message to Jason. I told Jason that I wanted to move one Supervisor to the second shift on a rotating basis, Jason told me know that I could not do that, that both had children.

**November 2017**

I walked into the Office and Tabitha told Jason, I'm so done talking to you, you can shut up, now go back into your office. Jason said, so you are kicking me out, Tabitha said yes, and Jason said I guess I go back into my Office. Violation of the Hospital Conduct Policy

**December 2017**

Jason called me into the Office and he told me that Brandy was going to start working in Sterile Processing. I told Jason that I don't agree with here coming to work in Sterile Processing since Brandy had no experience at all that she worked in the Cafeteria. Jason said that Laura, Jerry had spoken to Brandy and she said she love to work at Baylor and she would like to stay on and if they had anything where she could work. Laura said she can work in Sterile Processing and wash dishes there is nothing to it. I told him yes there is, and Jason said she is coming and you must train here, and you must have your staff teach her how to clean the Instruments. I told Jason that I was short staffed already and that someone would have to stay by her side and watch what she was doing. If she makes a mistake she can ruin the instruments.

**January 2018**

**January 24.2018**

Dr. Bollinger had a stroke I believe, and he was on of the surgeon working at the hospital. Sherry is a nurse at the Hospital come to work in regular clothing. She was in the Control room talking with an Anesthesiologist. Jason came into the office and Jason said oh my god looked at you. It made me feel uncomfortable the way he conducted himself. The Anesthesiologist told Jason what is wrong with you, Jason said well I never seen her like this I'm just admiring her. Sherry said to Jason you such a Jackass sometimes and they all laughed, and Jason left the Office. A violation of the Hospital conduct policy.

Chris a charge Nurse told Dr. Kent in front of Jason you can go and fuck yourself. Jason laughed and walked out of the Office.

Jason wrote me up because of the pin cutter that was broken. He said I lied about what had happen to the pin cutter. I told Jason that I did not lie about what had happen and that I had told him what I did. I told Jason I don't have any reason to lie. Linda Marshall was present at that time as well. I also ask Linda where I would have to wear the face mask. Linda said she would get me the Hospital Policy as to where I had to wear the mask. After two weeks she finally gave me the policy. I was reading the policy and the policy states that I must wear a Mask in patient care area. After I was reading the policy I told Linda, so I can eat in the Cafeteria and she said not the hospital can make up where the employees can eat. I told Linda the same thing that the Cafeteria was not a patient care area. I also ask here where I can eat then, and Linda said you can eat in the employee launch. One of the Nurses I saw when I was upstairs dropping off paper. I don't know her name. She asks me why I'm not eating at the cafeteria anymore and I told her that I was told that I could not since it was a patient care area and the Hospital can say where you can eat and

where you can't eat. This Nurse also did not take the Flu shut and she said always eats in the Cafeteria and nobody said anything to here. She said you should just come and eat up here. I told her no, if I do I just get in trouble.

Jason came to me one and ask me if I had a copy for the CER for the Ear set containers. I ask him what happen to the one I gave him, and Jason said that Jerry had thrown it in the trash.

After we had come back to work in January Jason had a meeting with my Department. Jason said he wanted the peel packs fixed and he wanted it done now. I told Jason that William is going to have it done this month but that the staff wanted to catch up on the instruments first, so we could get them on the shelf. That this to me was more important then fixing the peel packs. Jason gave a week to have the peel packs fixed. That is not a reasonable time.

Belimed wanted to start a trial on the detergent that Belimed sell. Jason spoke with Jake and I had told Jason that the only detergent that I wanted to trial was for the washer but the detergent that is use for manually cleaning and the sonic I want to keep the way I had it. I was out the day the trial was to start and when I came back Jason had Jack with Belimed change out all the detergent that we were using. We started to have problems with the detergent from the start. I would inform Jason of the issues that we had that the test did not pass and that the detergent was not working properly. I never was involved in the conversation that went on between Jason and Jack. That is when the problem started with Belimed and that is what I was written up for as well.

## February 1. 2018

Diana came into the Office she is a Nurse. She was totally distraught, and she told Karen you not going to believe what Jason just said to me, he said when are you going to retire you old and you taking the job away from young people. Karen said I'm just going to be quit right now. Wendy said did he mean it, or did he say it in a joking matter and Diana said no he meant it. I said now I understand. Karen said I'm just going to quit.

Same month, Keith, Diana where talking to Karen and Keith told Karen next year I'm going to retire. Karen said, I believe it when I see it and Diana said, I just wish Jason stops asking me when I'm going to retire. Diana said I just want to tell him dude I retire when I want to what's it to you.

When we had a Craniotomy meeting with Brian Best, Tabitha, Wendy, Jason and myself were at this meeting. Tabitha told Jason when you are going to start doing your job.  You let them get away with everything. I don't have your support and we can't do crani cases if we can't have the

techs to scrub the cases. Kimmy, Levi and Karl say they are not going to take call and you don't make the other techs learn on how to do a crani. Jason told Tabitha I don't have a problem with that, I can tell them. I would have been fired if I said that. Brian said to me you can leave now that is between them. So, I left.

Jason, Wendy, Tabitha and myself were in the Office. Jason ask Wendy if she really wanted to interview a candidate for a Nurses position. Jason told Wendy are you sure, she is kind of old: do you really want to interview her. Wendy said how do you know how old she is, Jason said you can tell by the name how old someone is since they don't have these names any longer. Jason looked at me and told Wendy lets talk about this in my Office and both left the Office.

**The End of "In Her Own Words"** - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

---

16.    Plaintiff suffered the following *adverse employment actions* among others: a) changes in the working conditions of Plaintiff, b) changes in job duties of Plaintiff, c) changes in the shifts and days Plaintiff was required to work, d) changes in the work location for Plaintiff, e) Plaintiff being given more work to accomplish than can be achieved within the work day, f) Plaintiff not being provided training for the specific job duties assigned to Plaintiff, g) Plaintiff being given a bogus disciplinary write ups, h) Plaintiff being denied promotion; i) Plaintiff being denied benefits, j) Plaintiff not receiving the correct amount of pay tantamount to a pay reduction, k) Plaintiff's loss of earning capacity, l) Plaintiff's loss of past and future income, m) Plaintiff's loss of employment opportunities, n) Defendants not applying and enforcing their policies equally among all employees, o) Defendants not applying and enforcing its coaching for success policy with Plaintiff, p) Defendants not taking any steps to stop the discrimination, harassment and other conduct complained about by Plaintiff, q) Defendants maintaining a work environment that denies Plaintiff an opportunity to succeed, r)

Defendants maintaining a work environment that denies Plaintiff an opportunity to be promoted, s) providing Plaintiff unfounded negative performance reviews, t) ongoing intimidation, ridicule, insults, rumors and innuendoes concerning Plaintiff, especially about being a female, over forty (40) years of age, with medical conditions and about her work product and reputation from managers, co-workers and others of Defendant.

17.     On May 17, 2018 Plaintiff filed her Initial Charge of Discrimination with the United States Equal Employment Opportunity Commission.

18.     On or about May 25, 2018 Defendant received the Charge of Discrimination filed with the United States Equal Employment Opportunity Commission by Plaintiff.

19.     As a result of the increased discrimination and harassment combined with the adverse employment actions, Plaintiffs' stress level was elevated which exacerbated Plaintiffs' medical conditions.

20.     On or about May 17, 2018 Plaintiff received her Notice of Rights aka "right to sue" letter from the United States Equal Employment Opportunity Commission.

21.     On or about August 10, 2018 Plaintiff filed her Original Complaint (Doc. 1) with the Clerk of the United States District Court for the Northern District of Texas, Fort Worth Division.

## IX. DAMAGES

22.     As a direct and proximate consequence of Defendant's unlawful and discriminatory employment policies and practices, Plaintiff has suffered losses including, but not limited to: front pay, back pay, costs of court, legal expenses, expert fees, mediation fees, attorney fees, mental anguish, humiliation and

emotional distress in the past and future, prejudgment and post judgment interest, benefits, actual damages, special damages, expenses, medical expenses, liquidated damages, and punitive damages, all to be specified at trial, any injunctive relief deemed appropriate and available under the statutes which Plaintiff brings this action as well as any and all other relief deem just either in equity or law.

## X. CAUSES OF ACTION

### COUNT ONE – AGE DISCRIMINATION
### 29 U.S.C. §623(a)(1)
### IN THE WORKPLACE AT USP

23.     Defendant, USP has violated 29 U.S.C. §623(a)(1), Chapter 21 of the Texas Labor Code and other similar state statutes.

24.     Plaintiff repeats and re-alleges Paragraphs 1 through 22.

25.     Plaintiff is over forty (40) years old.

26.     Plaintiff has established her prima facia case of age discrimination.

27.     The conduct of USP was directly aimed at Plaintiff an older employee with more seniority than others.

28.     The conduct of USP violates not only the Age Discrimination in Employment Act **(ADEA)** but also its amendment titled the Older Workers Benefit Protection Act **(OWBPA)**.

29.     The discriminatory and retaliatory conduct of Defendant caused Plaintiff to suffer age discrimination; thereby violating the rights of Plaintiff protected by the Age in Employment Discrimination Act, Older Workers Benefit Protection Act, Title VII, Chapter 21 of the Texas Labor Code and other similar state statutes.

30.     As evident from the facts above the conduct of USP was directed at

Plaintiff because she was over forty (40) years old.

31.    Defendant intentionally caused Plaintiff to suffer adverse employment actions.

32.    USP's decision to intentionally cause Plaintiff to suffer adverse employment actions was based on Plaintiff's age.

33.    USP's decision to intentionally cause Plaintiff to suffer adverse employment actions was made by persons younger than Plaintiff.

34.    USP's decision to intentionally cause Plaintiff to suffer adverse employment actions was made by younger employees without following Defendants written policy.

35.    USP treats younger employees different than older employees like Plaintiff.

36.    USP intentionally and willfully discriminated against Plaintiff and others.

37.    The unlawful employment practices complained of herein were intentional.

38.    The unlawful employment practices complained of herein were done with malice or reckless indifference to the protected rights of Plaintiff and other employees over forty (40) years old.

39.    As a result of Defendants discriminatory conduct, Plaintiff has suffered and will continue to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with her employment.

40.    As a result of Defendants discriminatory conduct, Plaintiff has suffered non-pecuniary losses, including but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-

pecuniary losses.   Because of these losses Plaintiff seeks compensatory damages.

41.     Defendants actions were done with malice and/or with reckless indifference to Plaintiff's protected rights.  Plaintiff is therefore entitled to punitive damages.

42.     Plaintiff also seeks reasonable attorneys' fees, court costs and including reasonable expert fees.

43.     Plaintiff suffered damages as alleged in Section IX.

**COUNT TWO - HOSTILE WORK ENVIRONMENT**
**42 U.S.C. §2000e & 42 U.S.C. §1981**
**IN THE WORKPLACE AT USP**

44.     Defendant, ***USP*** has violated 42 U.S.C. §2000e, 42 U.S.C. § 1981, Chapter 21 of the Texas Labor Code and other similar state statutes.

45.     Plaintiff repeats and re-alleges Paragraphs 1 through 43.

46.     Plaintiff is a female over forty (40) years old.

47.     Plaintiff has established her prima facia case of hostile work environment.

48.     ***USP*** knowingly allowed the discrimination, ridicule, insults, rumors and innuendoes concerning Plaintiff, especially about her being a female, over forty (40) years old and about her work product and reputation to continue unabated which contributed to the hostile work environment.

49.     ***USP*** took NO steps to reduce or eliminate the hostile work environment, especially when Plaintiff requested the adverse employment actions, discrimination, harassment, hazing, bullying, ridicule, insults, rumor and innuendos to stop; however ***USP*** refused to honor said request.

50.     As a result of *USP*'s failure to honor Plaintiff's request, the adverse employment actions, discrimination, harassment, hazing, bullying, ridicule, insults, rumors and innuendos increased at the workplace, to the point where Plaintiff was overwhelmed and exhausted thereby aggravating Plaintiff's medical condition.

51.     Although *USP* knew of the hostile work environment, *USP* took NO remedial action to stop the hostile work activities and prevent those types of unlawful activities from occurring in the future.

52.     In fact not only did *USP* not take any remedial action to stop the hostile work environment, *USP*, managers, supervisors, preceptors and others themselves contributed to the hostile work environment.

53.     *USP*'s management, supervisors, preceptors & others including supervisors of Plaintiff and Jason Smith and others, together and individually, willingly, knowingly and intentionally, by their acts or failure to act subjected Plaintiff to mental abuse.

54.     Plaintiff was subjected to direct mental abuse, bullying and intimidation from *USP*'s management, supervisors, preceptors & others including but not limited to supervisors of Plaintiff and Jason Smith and others, together and individually, when they provided instructions and guidance to Plaintiff in direct contravention to *USP* policies, procedures and instructions and guidance provided routinely to other employees in the workplace.   *USP*'s selective application of a facially neutral policy is evidence of pretext, as many courts have concluded.   See:  *E.E.O.C. v. Louisiana Office of Community Services*, 47 F.3d 1438, 1445-46 (5th Cir. 1995); see also: *Jenkins v. Ball Corp.*, 140 F. App'x 519,

526 (5th Cir. 2005).

55.    Plaintiff was subjected to direct mental abuse, bullying and intimidation from *USP*'s management, supervisors, preceptors & others including but not limited to supervisors of Plaintiff and Jason Smith and others, together and individually, when they caused Plaintiff to endure the adverse employment actions.

56.    The continuous hostile work environment at *USP*'s workplace created by *USP*'s management, supervisors, preceptors and others and Jason Smith directly caused Plaintiff severe emotional distress includes painful emotional reactions, such as; embarrassment, shame, humiliation, difficulty sleeping, emotional physical manifestations from stress, depression and worry, among other things.

57.    All of the events outlined here in totality establishes a hostile work environment exist at *USP*.

58.    The unlawful employment practices complained of herein were intentional.

59.    Plaintiff suffered damages as alleged in Section IX.

**COUNT THREE – RETALIATION**
**42 U.S.C. 2000e-3(a)**
**IN THE WORKPLACE AT USP**

60.    Defendant, USP has violated 42 U.S.C. §2000e-3(a), Chapter 21 of the Texas Labor Code and other similar state statutes.

61.    Plaintiff repeats and re-alleges Paragraphs 1 through 59.

62.    Plaintiff participated in a protected activity.  42 U.S.C. §2000e-3(a); *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 427-28 (5th Cir. 2000).

63.    Plaintiff suffered adverse employment actions as outlined in paragraph 16

above.   But for Plaintiffs' participation in protected activity, Plaintiff would not have been subjected to the discrimination, harassment and adverse employment actions described herein.   *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008); see also: *Group Von Graupen v. Burlington Coat Factory of Tex., L.P.* 2013 U.S. Dist. LEXIS 37547; 2013 WL 1143359.

64.   Plaintiff has established her prima facia case of retaliation.

65.   USP managers, supervisors, preceptors and others retaliation against Plaintiff during 2016, 2017 & 2018 through the present include, but not limited to:

1)   USP, management, supervisors, preceptors and others uttering unproductive disparaging remarks to Plaintiff; and

2)   USP, management, supervisors, preceptors and others undermining Plaintiff; and

3)   USP, management, supervisors, preceptors and others creating events at the workplace to cause more stress and aggravation for Plaintiff; and

4)   USP, management, supervisors, preceptors and others blatantly discriminating against Plaintiff;

5)   USP, management, supervisors, preceptors and others causing adverse employment actions as outlined in paragraph 16 above;

6)   USP, management, supervisors, preceptors and others depriving Plaintiff from her federally protected rights;

7)   USP, management, supervisors, preceptors and others depriving Plaintiff from his Rights protected by the State of Texas;

8)   USP, management, supervisors, preceptors and others using the "good ole boy" system and favoritism within the workplace at USP; and

9)      USP, management, supervisor, preceptors and others using a systematic scheme to provide better employment opportunities and benefits to younger individuals, not over forty (40) year old, individuals, family, relatives, friends and associates; and

66.     Most if not all of the acts complained of within this entire Complaint were retaliatory in nature and directed toward Plaintiff.

67.     It is unlawful to retaliate against an individual for opposing discriminatory employment practices or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or litigation under Title VII of the Civil Rights Act of 1964, the Texas Labor Code and other similar statutes.

68.     During the course of Plaintiff's employment, USP, acting through its management, supervisors, preceptors, agents and vice principals, in a continuous course of conduct, discriminated against Plaintiff in the terms, conditions and privileges of her employment due to her age and due to retaliation for having participated in an EEOC proceeding and for having opposed conduct which she had a good faith belief was unlawful and/or discriminatory on the basis of age and race and for retaliation including in that:

> Defendants, through their agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation, discrimination and harassment in the terms, conditions, and privileges of her employment in retaliation for her filing a charge of discrimination with the EEOC and/or participating in a proceeding with that agency against her employer and/or because she opposed discrimination and retaliation at Defendants place of employment.  Plaintiff also asserts that the Defendant has engaged in age discrimination by its acts, in the violation of the law.

**VICARIOUS LIABILITY**
**RESPONDEAT SUPERIOR - RATIFICATION**
**IN THE WORKPLACE AT USP**

69.     The acts of Plaintiff's managers, supervisors, preceptors and co-workers were performed while in the employment of USP and were within the course and scope of that employment or within the authority delegated to the employee.

70.     Therefore the conduct of Plaintiff's managers, supervisors, preceptors and co-workers toward Plaintiff as outlined herein was performed while in the employment of USP.

71.     Further the conduct of Plaintiff's managers, supervisors, preceptors and co-workers toward Plaintiff as outlined herein was approved by USP as took no steps to change, alter, stop or modify said conduct.

72.     At the time of the conduct of Plaintiff's managers, supervisors, preceptors and co-workers were acting on USP's behalf.

73.     After the events complained of by Plaintiff, USP was fully aware of the actions of Plaintiff's managers, supervisors, preceptors and others where said conduct was approved by USP with its acts or failure to act.

74.     USP approved of the conduct of its employees, including Plaintiff's managers, supervisors, preceptors and co-workers acts with intent to validate them.

75.     Therefore USP is liable for the acts of its employees, including Plaintiff's managers, supervisors, preceptors and co-workers as outlined herein.

76.     The unlawful employment practices complained of herein were intentional.

77.     Plaintiff suffered damages as alleged in Section IX.

## COUNT FOUR – WRONGFUL TERMINATION
## IN THE WORKPLACE AT USP

78.     Defendant, USP has violated 29 U.S.C. §623, 42 U.S.C. §2000e-2(a)(1),

Chapter 21 of the Texas Labor Code and other similar state statutes.

79.     Plaintiff repeats and re-alleges Paragraphs 1 through 77.

80.     Plaintiff is a female who is over forty (40) years old who was employed

with **USP**.

81.     Plaintiff has established her prima facia case of wrongful termination.

82.     Plaintiff complained of the discrimination and unlawful employment

practices of the **USP**.

83.     On May 15, 2018, **USP** terminated Plaintiff.

84.     Plaintiff did not commit any act of misconduct.

85.     After completing its investigation the Texas Workforce Commission

issued its Determination Letter dated June 6, 2018 which found that Plaintiff

had no misconduct connected with her work.

86.     Plaintiff's brings her claims for wrongful termination under the following

law: "…wrongful termination under Title VII, Chapter 21 of the Texas Labor Code

and other similar statutes based on the theories of both mixed-motive and

pretext." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-36 (1989); *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Newman v. GHS*

*Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 157 (3rd Cir. 1995).

87.     Plaintiff is not asserting a Texas common law wrongful termination

claim.   It is apparent from this Complaint that Plaintiff is alleging wrongful

termination based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000*e et. seq.*, 29 U.S.C. §623 and Chapter 21 of the Texas Labor Code:

rather than a "free-standing claim for wrongful termination under Texas law."

Plaintiff bases her wrongful termination claims on specifically pled causes of

action for age discrimination, hostile work environment, retaliation, and under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, 29 U.S.C. §623

and Chapter 21 of the Texas Labor Code contained herein.

88.     Plaintiff seeks liquidated damages in an amount to be determined

within the jurisdictional limits of this court.

89.     Plaintiff seeks unliquidated damages within the jurisdictional limits of

this court.

90.     Defendants unlawful conduct complained of by Plaintiff herein was

done with malice or reckless indifference to the rights of Plaintiff which

entitles Plaintiff to exemplary damages under Texas Civil Practice &

Remedies Code section §41.003(a).

91.     Plaintiff also seeks reasonable attorneys' fees, court costs and

including reasonable expert fees.

## XI. INJUNCTIVE RELIEF

92.     Plaintiff restates, realleges, reavers and hereby incorporates by reference

any and all allegations contained herein, inclusive.  In addition, Plaintiff alleges

that the USP's discriminatory actions outlined herein must be enjoined by this

Court in order to force USP to comply with the law.  It is suggested that the

injunction be specific in enjoining USP, its management, supervisors, preceptors,

officers, agents, successors, employees, attorneys, assigns and other

representatives, and all those acting in concert; or participation with them and at

their direction, from engaging in any employment policy or practice shown to discriminate against Plaintiff in violation of Title VII on the basis of Age Discrimination and or like state statutes.

93.     That this Court retain jurisdiction for five (5) years to make sure USP is complying with the law.

## XII. DEMAND FOR A TRIAL BY JURY

94.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action. *See also:* U.S. Const. Amend. 7. In accordance with the Federal Rules, this jury demand is being filed with the Clerk of the United States District Court for the Northern District of Texas, Fort Worth Division as required by Fed. R. Civ. P. 5(d) and Fed. R. Civ. P. 38(b).

## XIII. PRAYER

**WHEREFORE**, Plaintiff respectfully prays this Court to:

a.  USP be summoned to appear and answer herein; and

b.  Issue findings of fact and conclusions of law that USP's acts, practices, and procedures, subjected Plaintiff to Age Discrimination, Hostile Work Environment, Retaliation and Wrongful Termination as complained of herein violated Plaintiff's rights as secured under Title VII and 29 U.S.C. 623 or like state statutes; and:

c.  Grant to Plaintiff a permanent injunction enjoining USP its management, supervisors, preceptors, officers, agents, successors, employees, attorneys, assigns and other representatives, and all those acting in concert; or participation with them and at their direction, from engaging in any employment policy or practice shown to discriminate against Plaintiff

in Age Discrimination, Hostile Work Environment, Retaliation and Wrongful Termination as complained of herein violated Plaintiff's rights as secured under Title VII and 29 U.S.C. 623 or like state statutes; and:

d. Grant to Plaintiff a judgment for damages, for Age Discrimination, Hostile Work Environment, Retaliation and Wrongful Termination against USP in an amount within the jurisdictional limits of this Court; and

e. Retain jurisdiction over this action to assure full compliance with the orders of this Court and with applicable law; and

f. Award Plaintiff judgment for his damages for mental abuse, pain and suffering, mental anguish and for the humiliation caused by USP's unlawful treatment in an amount within the jurisdictional limits of this Court; and

g. Plaintiff prays for an award of punitive damages in an amount determined by the Court to be appropriate to punish USP for the willful and malicious misconduct and necessary to deter USP from engaging in such misconduct in the future, in an amount within the jurisdictional limits of this Court; and

h. Plaintiff prays that the Court award Plaintiff costs and expenses of this action and award Plaintiff reasonable attorney fees as provided in 29 U.S.C. 623, Title VII, 42 U.S.C. §2000e-5(k), Texas Labor Code Chapter 21 and or like state statutes; and

i. Plaintiff, in accordance with her rights under the United States and Texas Constitutions, and statutory rights under Title VII 42 U.S.C. §2000e-5(k)

and or like state statutes demands a trial by jury on issues triable to a jury; and

j. Pre-judgment interest accruing at the rate of Six per cent (6%) per annum[1] from May 15, 2018 until the date of judgment; and

k. Post-judgment interest at the rate of Eighteen per cent (18%) per annum or at the highest legal or contractual rate allowed by law from the date of judgment until the judgment is paid; and

l. Judgment in the amount of Eighty Five Thousand Dollars **($85,000.00)** as initial attorney's fees plus additional attorney's fees when incurred in prosecution of this lawsuit, if Defendant does not appeal this judgment to the Fifth Circuit Court of Appeals and time for appeal to that court has expired, Defendant shall be entitled to a remittitur of Five Thousand Five Hundred Dollars ($5,500.00), against the judgment for attorney's fees; and if Defendant does not appeal from the Court of Appeals to the Supreme Court of the United States and time for that appeal has expired, Defendant shall be entitled to a remittitur of Four Thousand Five Hundred Dollars ($4,500.00) against the judgment for attorney's fees; and

m. All costs of court; and

n. All expert witness fees incurred in the preparation and prosecution of this action; and

---

[1] If no specific rate of interest is agreed on by the parties, 6 percent annual interest, starting thirty days after the amount is due and payable, maybe charged.  Tex. Const. art. XVI, § 11; Tex. Fin. Code Ann. §302.002 (Vernon Supp. 2003); see: *Miner-Dederick Construction Corp. v. Mid-County Rental Service, Inc.*, 603 S.W.2d 193, 200 (Tex. 1980).  This is sometimes referred to as "legal Interest."  T Fin C §§ 301.002(a)(8), 302.002.

o.  All court reporter fees incurred in the preparation and prosecution of this action; and

p.  Plaintiff be awarded damages as outlined in Section IX, paragraph 22 above; and

q.  Plaintiff be granted all writs necessary to enforce the judgment of this Court; and

r.  Plaintiff shall be awarded such other, further relief as the nature of the case may require or as may be determined to be just, equitable, or proper by the Court.

Respectfully submitted, this 8th day of August, 2018.

**/s/ Hiram McBeth**
Hiram McBeth, Esq.
State Bar No. 13329500
MCBETH LAW OFFICE
6060 N. Central Expressway, Suite #560
Dallas, Texas 75206
Telephone: (972) 498-8702
Facsimile:   (972) 680-4411
***ATTORNEY FOR PLAINTIFF***
***ERIKA E. COBURN***